# RECORD IMPOUNDED

**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS. A-5639-17T4
                A-5640-17T4

NEW JERSEY DIVISION
OF CHILD PROTECTION
AND PERMANENCY,

      Plaintiff-Respondent,

v.

R.L.M.,

      Defendant,

and

K.G. and E.R.,

      Defendants-Appellants.

_____

IN THE MATTER OF THE
GUARDIANSHIP OF A.A.M.D.A.
and A.A.L.M.,

      Minors.

_____

Argued January 27, 2020 – Decided February 21, 2020

Before Judges Sumners, Geiger and Natali.

On appeal from the Superior Court of New Jersey, Chancery Division, Family Part, Atlantic County, Docket No. FG-01-0009-18.

Catherine F. Reid, Designated Counsel, argued the cause for appellant K.G. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Catherine F. Reid, on the briefs).

Anne E. Gowen, Designated Counsel, argued the cause for appellant E.R. (Joseph E. Krakora, Public Defender, attorney; Robyn A. Veasey, Deputy Public Defender, of counsel; Anne E. Gowen, on the briefs).

Alexa L. Makris, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Jane C. Schuster, Assistant Attorney General, of counsel; Alexa L. Makris, on the brief).

Noel Christian Devlin, Assistant Deputy Public Defender, argued the cause for minors (Joseph E. Krakora, Public Defender, Law Guardian, attorney; Phyllis G. Warren, Designated Counsel, on the brief).

PER CURIAM

In these consolidated appeals, defendant fathers K.G. (Kevin) and E.R. (Edward) appeal the Family Part's July 23, 2018 order terminating their parental rights to their respective daughters, eleven-year-old A.A.M.D.A (Ann) and two-year-old A.A.L.M. (Anita), in accordance with the four-prong best interests test

A-5639-17T4

under N.J.S.A. 30:4C-15.1(a).[1] Defendant R.L.M. (Rita), the daughters' mother voluntarily surrendered her parental rights and is not a party to the appeals. The Law Guardian and the Division of Child Protection and Permanency (Division) urge that we uphold the termination orders. We affirm.

I.

A. Background

The record shows the Division conducted its most recent emergency removal of the children from Rita's care in December 2016, after Edward threatened to kill her.[2] This was not the first time that Rita alleged abuse by her daughters' fathers.

Over three years earlier, in June 2013, Kevin reportedly assaulted Rita in front of Ann, forcing them to leave his home. A year later, in August 2014, Rita took Ann to the hospital alleging Kevin sexual assaulted Ann, then seven years old, over a period of several years. Ann separately denied and confirmed that Kevin touched her inappropriately and exposed himself to her. Kevin denied the allegations but agreed to a safety plan with the Division. Following a police

---

[1] We use initials and fictitious first names to protect the identities of the parties. R. 1:38-3(d)(12).

[2] Prior removals had occurred in August 2015 of Ann, and January 2016 of Anita, immediately following her birth.

A-5639-17T4

investigation into Ann's allegations, Kevin was arrested and incarcerated in January 2015, for child endangerment and aggravated sexual assault. Kevin claimed Rita fabricated the allegations. The charges were dropped based upon insufficient evidence and Kevin was released from jail in the end of May.

While Kevin was in jail, Rita claimed he was stalking her, prompting the Division to order a psychological evaluation. She refused individual therapy, as did Kevin. The couple's drama continued after Kevin's release when Rita again alleged Kevin was stalking her, and Kevin charged that Ann was in danger due to Rita's mental instability. Soon thereafter, in the presence of Division caseworkers and her daughter Ann, Rita repeatedly threatened to kill Kevin.

On December 8, 2016, contrary to the court's order, Rita took Ann and Anita to an unsupervised visit with Edward. During this visit, Edward threatened to choke and kill Rita. Edward was subsequently arrested, convicted, and incarcerated for his terroristic threats. Rita obtained a temporary restraining order against Edward. Unfortunately, the family hosting Rita demanded she and the girls leave their home because of Edward's unsupervised visit. Thus, an emergent removal – with Rita's consent – of the girls occurred because she did not have a place to take them. The girls were placed in a prior resource home, where they have remained since. The resource parents hope to adopt them.

B. <u>Trial</u>

1. The Division's Case

During the eight-day guardianship trial, the Division presented the testimony of an expert and a Division caseworker. Dr. Alan J. Lee, a clinical forensic psychologist with a specialty in child abuse and neglect, testified regarding his psychological evaluations of Kevin and Edward, as well as his bonding evaluations of each child with the respective fathers and with the resource parents. Caseworker Kamise Thompson spoke about her involvement with the family, and the services provided to Kevin and Edward, consistent with the documentation in the record.

2. Kevin's Case

To refute the Division's contentions, Kevin presented the expert testimony of Dr. Janet Cahill, a licensed psychologist and Director of the Child Family Resource Center, and Dr. John Quintana, a licensed psychologist and expert on psychology and therapeutic visitation. Dr Cahill evaluated Rita and opined that Rita's constant questioning of Ann regarding Kevin's alleged sexual abuse caused Ann to accuse him in order to satisfy Rita's scheme against him. That said, Dr. Cahill's bonding evaluation with Ann, Anita, and the resource parents determined the children needed the permanency afforded through adoption, and

removal from the resource parents would present an enduring risk of harm to them. Dr. Quintana evaluated the therapeutic visits between Kevin and Ann that took place before Jan Rosenstein, a licensed clinical social worker, child trauma specialist, and family counselor with Child Teen Adult Matters Co, LLC. He claimed Ann seemed relaxed during their visits but explained she sometimes cancelled sessions because she did not want to see Kevin, which eventually resulted in visits being stopped.

Kevin sought to admit an ex parte letter written by a Division supervisor to a different court that was presiding over a related abuse and neglect litigation[3] involving defendants. The letter expressed concerns that Kevin was being treated unfairly. The court received the letter, but did not read it, and distributed copies to all parties. The letter reads:

> Your Honor,
>
> My name is Treasure Esochaghi. I am the Adolescent Supervisor at the Atlantic East DCP&P here in the City. I am writing you this letter due to some concerns that I have come to observe on the above mentioned FN case. The case was transferred to my unit in January 2017.
>
> I am attaching a letter written by [Ann] to her teacher on February 22, [2017,] when she was supposed to meet with Dr. Quintana and possibly her father if she agrees to do so. I will also attach my report with regards to

---

[3] The litigation was terminated due to the Division's guardianship complaint.

the charges made against my worker who went to pick up [Ann] on that date.

The first sentence on that letter is, "the front office will call you to say I have a visit with my birth dad." My concern with this is that we never tell the child that she is going to have a visit because we are not sure if that will happen. She is supposed to meet with Dr. Quintana and both will make the decision whether the child will see her father or not.

My worker was demonized and actually accused of threatening and disrupting the school and the child (an allegation the school denied) because he asked to see the letter and commented he believed the child may have been coerced into writing that letter.

My concern with this case is that it appears the child is in similar situation [sic] that she was with her mother. Her mother had a vendetta against her father and used the child in order to achieve her goal. The resource parents do not like the worker and they have made horrendous allegations against him and claim it was from the child. I sent another worker to speak with the child and the child has no ill-feelings toward her worker. Unfortunately, it appears all systems involved are bent on ensuring that [Kevin] never has any relationship with his daughter.

I had the case when the mother was allegedly being stalked by the father even though he was incarcerated at the same time. The child went along with her mother's story but when my worker then asked her, she admitted to never seeing her father but saying what her mother wants her to say.

Children are not trophies and advocacy is not lying and manipulating. I do not believe [Ann] is being

emotionally helped in her current placement. (I am not saying the resource parents are bad people.) I say this because the foster parents are projecting their dislike unto her just like her mother did with regards to her father. They are so enmeshed that they believe this is their case. The unfortunate thing about this is that almost every system that is involved in this case is supporting that. It is very scary to think that the systems that are put in place to ensure well-being of children can be so biased they made decisions based on fronts and emotions.

I am reaching out to you because I believe you are impartial and will not be swayed by the shenanigans that are being presented on this case. [Ann] may never get over the brainwashing but she needs an opportunity to try. [Kevin] may never get his child back but needs an opportunity to at least have a relationship with her.

I am a licensed social worker and a Master Level Therapist and I have been on this job since 2004. This is my first time of seeing foster parents go to this length to adopt children.

If you have any questions . . . .

At the guardianship trial, the court refused to admit the letter, stating the prior court had already "rejected" it and refused to read it because it was an ex parte communication. Nonetheless, the court admitted annexed Division contact sheets expressing many of the same concerns set forth in the letter. The court also denied Kevin's reconsideration motion to admit the letter, explaining that

no new information had been provided in support of the motion for reconsideration. The court also stated the letter "is in fact a hearsay document."

### 3. Edward's Case

In his defense, Edward presented the expert testimony of Dr. Gerard Figurelli, a clinical forensic psychologist and alcohol and drug counselor with an expertise in parental capacity and bonding. Based upon his psychological evaluation of Edward and bonding evaluation between Edward and Anita, the doctor opined that Edward had no diagnosable psychiatric illness and there were no impediments to Edward's parenting capacity in the future. However, because Edward never cared for Anita, and did not have a stable residence or plan for raising her, Dr. Figurelli stated Edward was not able to parent immediately and would require a gradual transition to do so. Dr. Figurelli further testified that Anita has a "positive but limited attachment" to her farther, and there would be a risk of severe and enduring harm if she permanently separated from him.

Also testifying for Edward was Jasmine Small, an activity coordinator who monitors parent child visits for the Center for Family Services, a non-profit organization funded by the Division. Small discussed Edward's participation in visits with Anita and his successful completion of parenting education classes.

She claimed Anita always seemed happy to visit with Edward and that they appeared to have bonded.

Edward testified on his own behalf regarding his income and ability to support Anita if he were awarded custody. He admitted he lived with his aunt and uncle, who were unwilling to allow Anita to move-in, but claimed he had a large family support system that could assist in caring for her and was looking into alternative residences. He testified he would allow Anita to continue to have contact with Ann.

### 4. The Law Guardian's Case

The Law Guardian presented expert testimony to support its position that the fathers' parental rights should be terminated. Dr. JoAnne Gonzalez, a psychiatrist and expert in clinical and forensic psychology with a specialty in child abuse and neglect, performed a psychological evaluation of Kevin, a bonding evaluation between Kevin and Ann, and a bonding evaluation of Ann with the resource parents. She believed Kevin was purposefully deceitful, and wanted his oldest daughter to care for Ann.[4] Dr. Gonzalez recommended termination of Kevin's parental rights based upon her assessment that Kevin has:

---

[4] Kevin is the father of eleven children with seven women. There is no indication in the record that he had custody of any of these children.

(1) a personality disorder with narcissistic antisocial traits; (2) an impulse control disorder; (3) an inability to empathize; and (4) mental health concerns that are unlikely to change. She further stated that Ann associates "chaos" with Kevin, making him unable to capably parent. Regarding her bonding evaluation between Kevin and Ann, Dr. Gonzalez testified it was clear there was "great tension" between them, and that Ann did not feel safe with him. With respect to Ann's bonding with her resource parents, Dr. Gonzalez concluded there was a strong and secure bond, and they would be able to ameliorate any harm to Ann from her separation from Kevin, whereas Kevin would be unable to ameliorate the harm to Ann if she were separated from them.

Following trial, the court issued an order based on reasons set forth in an oral opinion that the Division had proven, by clear and convincing evidence, all four prongs of the statutory best interests test under N.J.S.A. 30:4C-15.1(a) to terminate Kevin's parental rights to Ann, and Edward's parental rights to Anita.

II.

In their respective appeals, Kevin and Edward both contend the Division failed to prove the best interests test to terminate their parental rights by clear and convincing evidence. Kevin asserts none of the test's four prongs were proven by the Division, whereas Edward limits his challenge by arguing the

11

Division did not prove the first three prongs of the test.[5]  None of these contentions have merit.

Our scope of review in Title 30 guardianship cases is limited.  The trial court's findings in such cases generally should be upheld so long as they are supported by "adequate, substantial, and credible evidence."  N.J. Div. of Youth & Family Servs. v. R.G., 217 N.J. 527, 552 (2014).  The court's decision should only be reversed or altered on appeal if its findings were "so wholly unsupportable as to result in a denial of justice."  N.J. Div. of Youth & Family Servs. v. P.P., 180 N.J. 494, 511 (2004).  We must give substantial deference to the trial judge's opportunity to have observed the witnesses first-hand and to evaluate their credibility.  R.G., 217 N.J. at 552.  We must also recognize the expertise of the Family Part in matters involving the alleged abuse or neglect of children.  See, e.g., N.J. Div. of Youth & Family Servs. v. F.M., 211 N.J. 420, 448 (2012); N.J. Div. of Youth & Family Servs. v. L.J.D., 428 N.J. Super. 451, 476 (App. Div. 2012).

---

[5]  Edward's initial merits brief does not argue the court erred in determining the Division satisfied the fourth prong of the best interests test, but he does so in his reply merits brief.  Because "[a]n appellant may not raise new contentions for the first time in a reply brief," we do not consider the argument.  L.J. Zucca, Inc. v. Allen Bros. Wholesale Distribs., Inc., 434 N.J. Super. 60, 87 (App. Div. 2014).  Nonetheless, we briefly mention and reject the contention in footnote 6.

Applying these principles, we separately address each prong of the best interests test challenged by defendants' appeals.

A. <u>Prongs One and Two</u>

As to prong one, the Division must prove "[t]he child's safety, health, or development has been or will continue to be endangered by the parental relationship[.]" N.J.S.A. 30:4C-15.1(a)(1). The Division has the responsibility to "protect children whose vulnerable lives or psychological well-being may have been harmed or may be seriously endangered by a neglectful or abusive parent," which may require the severance of parental ties as a "weapon of last resort." <u>F.M.</u>, 211 N.J. at 447. "[T]he relevant inquiry focuses on the cumulative effect, over time, of harms arising from the home life provided by the parent." <u>N.J. Div. of Youth & Family Servs. v. M.M.</u>, 189 N.J. 261, 289 (2007).

"Serious and lasting emotional or psychological harm to children as the result of the action or inaction of their biological parents can constitute injury sufficient to authorize the termination of parental rights." <u>In re Guardianship of K.L.F.</u>, 129 N.J. 32, 44 (1992) (citing <u>In re Guardianship of J.C.</u>, 129 N.J. 1, 18 (1992)). As a result, "courts must consider the potential psychological damage that may result from reunification[,] as the 'potential return of a child to a parent

may be so injurious that it would bar such an alternative.'" L.J.D., 428 N.J. Super. at 480-81 (quoting N.J. Div. of Youth & Family Servs. v. A.W., 103 N.J. 591, 605 (1986)). The Division "must show that the alleged harm 'threatens the child's health and will likely have continuing deleterious effects on the child.'" F.M., 211 N.J. at 449 (quoting In re Guardianship of K.H.O., 161 N.J. 337, 352 (1999)). "The absence of physical abuse or neglect is not conclusive." A.W., 103 N.J. at 605 (quoting In re Guardianship of R., 155 N.J. Super. 186, 194 (App. Div. 1977)). "A parent's withdrawal of . . . solicitude, nurture, and care for an extended period of time is in itself a harm that endangers the health and development of the child." In re Guardianship of DMH, 161 N.J. 365, 379 (1999). "Courts need not wait to act until a child is actually irreparably impaired by parental inattention or neglect." Id. at 383.

As to prong two, the Division must prove that "[t]he parent is unwilling or unable to eliminate the harm facing the child[ren] or is unable or unwilling to provide a safe and stable home . . . and the delay of permanent placement will add to the harm." N.J.S.A. 30:4C-15.1(a)(2). That harm may include evidence that separating the children from their resource parents "would cause serious and enduring emotional or psychological harm . . . ." Ibid.

The Division can establish the second prong by proving that a "child will suffer substantially from a lack of stability and a permanent placement[,] and from the disruption of" a bond with the resource parents. K.H.O., 161 N.J. at 363. Because they are related, evidence supporting the first prong may also support the second prong "as part of the comprehensive basis for determining the best interests of the child." DMH, 161 N.J. at 379.

1. Kevin

Kevin argues the court erred in finding he exposed Ann to harm or the risk thereof. He alleges Ann's fear of him and his inability to eliminate this fear, is not harm within the meaning of prong one. Because he did not cause Ann's fear of him, Kevin maintains he should not be required to mitigate the fear as required by prong two. He also argues his failure to complete services did not harm Ann.

Based on the court's credibility findings regarding the witnesses' testimony, and the facts surrounding the incidents that prompted Ann's fears of Kevin, there is clear and convincing evidence to support the court's determination that continuing Ann's father and daughter relationship with Kevin would harm her based on his history of being unable to provide a safe home to

properly nurture and care for her.  Kevin has not refuted the Division's evidence that he is unable to establish a safe and stable home for Ann.

The court further determined Kevin harmed Ann, crediting Drs. Lee and Gonzalez' opinions that the totality of Kevin's conduct caused harm to Ann because she was fearful and anxious around him despite therapeutic visits intended to assuage that fear.  Kevin's argument that he did not cause this harm is unsupported by the record, which documents his frequent outbursts and antagonism toward Ann that he cannot control.  For example, he repeatedly called Ann a "liar" regarding her allegations of sexual assault.  It is beyond difficult to understand how a father can raise a child under the cloud of this hostility.

Kevin's assertion that the possibility of future harm does not satisfy prong one is contradicted by our case law, specifically F.M. and DMH.  While he did complete some services, including drug and alcohol rehabilitation while incarcerated, Kevin's failure to complete all the offered services resulted in his absence from Ann for long periods of time during which time she bonded with the resource family.

## 2. Edward

Edward argues the court erred in finding the Division satisfied the first prong because his drug usage (marijuana) did not harm Anita and the record did not demonstrate that his propensity for violence and rule-breaking would endanger her. He also argues he was committed to cease all drug use if Anita was under his sole care.

Credible evidence in the record demonstrates Edward failed to complete several substance abuse evaluations, and he acknowledged his ongoing marijuana use. His drug use, together with the likelihood of violent criminal recidivism, place him at increased future risk of incarceration, which, if Anita was under his sole care, would render her without a caregiver and expose her to harm. Contrary to Edwards' assertion, drug use was not the sole reason considered by the court in terminating his parental rights. Significant to the court's order was his terroristic threats to Rita in December 2016, which caused Anita harm and prompted her second emergency removal.

We see no basis to reject the court's reliance on Dr. Lee's opinion, given within a reasonable degree of psychological certainty, that Edward's twenty-year-old conviction for manslaughter of his father and his other negative personality traits demonstrated the potential for recidivism and future harm to

17

Anita. Edward's assurances that he would stop using drugs if awarded custody, is undermined by his repeated positive urine screens. This, in turn, reflects his inability to eliminate harm to Anita, and places him at risk for incarceration and the goal of permanency. In fact, his own expert, Dr. Figurelli, recognized Edward was unable to provide Anita with a safe and stable home at the time of the evaluation and would require additional time to do so.

B. <u>Prong Three</u>

As to prong three, the Division is required to make "reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home[,] and the court [will] consider[] alternatives to termination of parental rights[.]" N.J.S.A. 30:4C-15.1(a)(3). This prong "contemplates efforts that focus on reunification of the parent with the child and assistance to the parent to correct and overcome those circumstances that necessitated the placement of the child into foster care." <u>K.H.O.</u>, 161 N.J. at 354.

The Division must prove that it "has made reasonable efforts to provide services to help the parent correct the circumstances which led to the child's placement outside the home." N.J.S.A. 30:4C-15.1(a)(3). "Reasonable efforts" include, but are not limited to:

(1) consultation and cooperation with the parent in developing a plan for appropriate services;

(2) providing services that have been agreed upon, to the family, in order to further the goal of family reunification;

(3) informing the parent at appropriate intervals of the child's progress, development, and health; and

(4) facilitating appropriate visitation.

[N.J.S.A. 30:4C-15.1(c).]

"Whether particular services are necessary in order to comply with the [reasonable] efforts requirement must . . . be decided with reference to the circumstances of the individual case before the court[.]" DMH, 161 N.J. at 390.

The Division

> must encourage, foster and maintain the bond between the parent and child as a basis for the reunification of the family. [It] must promote and assist in visitation and keep the parent informed of the child's progress in foster care. [It] should also inform the parent of the necessary or appropriate measures he or she should pursue in order to continue and strengthen that relationship and, eventually, to become an effective caretaker and regain custody of his or her children.
>
> [Ibid. (citing N.J.S.A. 30:4C-15.1(c)).]

A court is required to consider alternatives to the termination of parental rights. N.J.S.A. 30:4C-15.1(a)(3). "[A]ssessment of relatives is part of the

Division's obligation to consult and cooperate with the parent in developing a plan for appropriate services that reinforce the family structure." N.J. Div. of Youth & Family Servs. v. K.L.W., 419 N.J. Super. 568, 583 (App. Div. 2011).

N.J.S.A. 30:4C-12.1(a) requires the Division to initiate a search for relatives who may be willing and able to provide the care and support required by the child within thirty days of accepting a child into its care or custody. The Division must assess each interested relative and, if it determines that the relative is unable or unwilling to care for the child, inform them of its reasons for a denial of placement. N.J.S.A. 30:4C-12.1(a)-(b).

"It is the policy of [the Division] to place, whenever possible, children with relatives when those children are removed from the custody of their parents." N.J. Div. of Youth & Family Servs. v. K.F., 353 N.J. Super. 623, 636 (App. Div. 2002). "The Division's statutory obligation does not permit willful blindness and inexplicable delay in assessing and approving or disapproving a relative known to the Division[.]" K.L.W., 419 N.J. Super. at 582. It cannot ignore relatives "based upon an arbitrary, preordained preference for the foster placement" and "must perform a reasonable investigation of . . . relatives that is fair, but also sensitive to the passage of time and the child's critical need for

finality and permanency." <u>N.J. Div. of Youth & Family Servs. v. J.S.</u>, 433 N.J. Super. 69, 87 (App. Div. 2013).

### 1. <u>Kevin</u>

Kevin argues the court erred in finding the Division established the third prong because the Division did not provide reasonable efforts to assuage Ann's fear of him. He does not allege the Division failed to consider alternatives to the termination of his parental rights.

Credible evidence in the record supports the court's findings that the Division offered therapeutic visitation, psychological and bonding evaluations, anger management counseling, parenting skills classes, and individual therapy to Kevin. Despite these services, Drs. Lee and Gonzalez opined Kevin was still not a suitable placement option for Ann. The record demonstrates the Division allowed Kevin to foster a parental relationship with Ann. Yet, Ann repeatedly refused to see him due to her deep-seated and ongoing fear of Kevin, which as noted was in-part caused by Kevin's on-going behavior when interacting with Ann.

### 2. <u>Edward</u>

Edward argues the Division failed to provide reasonable efforts toward reunification, and failed to consider placing Anita with his sister, T.C. Credible

evidence in the record refutes this assertion. T.C. was properly ruled out as a placement option because of the harm that would occur from separating Ann and Anita. Shorty, after Anita's birth in January 2016, T.C.'s impending surgery precluded placement for months. Anita's reunification with Rita shortly thereafter in late 2016, eliminated the need for placement with T.C. When Edward's terroristic threats necessitated a second emergency removal in December 2016, T.C. was considered, but Ann and Anita had bonded significantly during their year in the resource home and needed to remain together.

Edward's contention that the bond between Ann and Anita is not sufficient to overcome his right to parent Anita and that he would allow them to have contact if he were awarded custody of Anita overlooks the evidence, including Dr. Cahill's opinion, which emphasizes the especially strong bond between Ann and Anita that started when Ann was notified of Rita's pregnancy with Anita. Their placement together since Anita's birth, which was cemented after their host family discontinued hosting them and Rita in 2016 due to Edward's threats, serves as valuable stability in their lives. See New Jersey Division of Youth & Family Services v. D.M., 414 N.J. Super. 56, 80 (App. Div. 2010) (holding that

22

bonds with others can support termination of parental rights where the biological parent is responsible for a delay in reunification).

C. Prong Four

Under prong four, the Division must demonstrate by clear and convincing evidence that "[t]ermination of parental rights will not do more harm than good." N.J.S.A. 30:4C-15.1(a)(4).  The prong focuses on the important consideration of a child's need for permanency.  M.M., 189 N.J. at 281.  "The question to be addressed under that prong is whether, after considering and balancing the two relationships, the child will suffer a greater harm from the termination of ties with her natural parents than from the permanent disruption of her relationship with her foster parents."  K.H.O., 161 N.J. at 355.  In order to weigh any potential harm from terminating parental rights against a child's separation from his or her foster parents, a court must consider expert testimony on the strength of each relationship.  J.C., 129 N.J. at 25.  "[W]here it is shown that the bond with foster parents is strong and, in comparison, the bond with the natural parent is not as strong, that evidence will satisfy . . . N.J.S.A. 30:4C-15.1(a)(4)." K.H.O., 161 N.J. at 363.

### 1. Kevin

Kevin argues the court erred in finding the Division established the fourth prong because termination of his parental rights would do more harm than good, and he was not given a sufficient opportunity to mend his relationship with Ann.

As with the other prongs, credible evidence in the record supports the court's findings regarding the fourth prong of the best interests test. We see no wrong in the court's credit of the opinions of Drs. Lee and Gonzalez that Ann would be relieved if her relationship with Kevin were severed. Their testimony firmly established Ann had significant and positive bonds with the resource parents, but an avoidant and insecure attachment to Kevin, despite several attempts through therapeutic visitation to remedy Ann's disaffection towards him. Kevin's assertion that he was not given an opportunity to mend his relationship with Ann is undermined by the therapeutic visits. Dr. Lee's testimony made clear there is a low risk of Ann experiencing harm if her relationship with Kevin was terminated. We also find favor with the court's finding that keeping the sisters together and giving them some permanency were of prominent concern. See N.J.S.A. 9:6B-4.[6]

---

[6] As mentioned above in footnote 5, we do not address Edward's argument regarding the fourth prong because it was belatedly raised in his reply brief.

Lastly, we address Kevin's claim that the court erred in refusing to admit into evidence an ex parte letter to the abuse and neglect court by a Division supervisor alleging the resource parents infected their dislike of him on Ann. We conclude the court did not abuse its discretion in refusing to admit the letter into evidence. See Griffin v. City of E. Orange, 225 N.J. 400, 413 (2016) (alteration in original) (quoting State v. Brown, 170 N.J. 138, 147 (2001)) ("When a trial court admits or excludes evidence, its determination is 'entitled to deference absent a showing of an abuse of discretion, i.e., [that] there has been a clear error of judgment.'").

The letter was an ex parte communication to the court and the other parties in the case did not have the opportunity to respond to the allegations contained therein. Because the author did not testify at trial, the Division had no opportunity to cross-examine her regarding its numerous unproven statements suggesting Ann was coached, or that she did not truly oppose visits with Kevin. Accordingly, the letter was properly excluded from evidence under our Code of

---

Nonetheless, his argument is without merit based upon the court's reliance on the credible testimony of Dr. Lee that Anita had no bond with Edward and termination of Edward's parental rights would not do more harm than good, and the resource parents would be able to ameliorate any harm that might occur.

Judicial Conduct and evidence rules pertaining to hearsay. Code of Judicial Conduct Rule 3.8 ("Except as authorized by law or court rule, a judge shall not initiate or consider ex parte or other communications concerning a pending or impending proceeding."); N.J.R.E. 801(c) (defining hearsay as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted"). The letter does not fall within the business records hearsay exception because it was not written in the regular course of the Division's business but seems to have been written in response to a situation which the author observed for the "first time" in her career. See N.J.R.E. 803(c)(6). There is no indication it is the regular practice of the Division to send such letters, as the Division's concerns are typically recorded in contact sheets.

Additionally, Kevin misplaces his reliance on In re Civil Commitment of J.M.B., 395 N.J. Super. 69, 93 (App. Div. 2007), in claiming the letter should have been admitted because Dr. Gonzalez reviewed it in the course of her evaluations. J.M.B. merely holds that such documents are often admitted and does not specifically call for their unfettered admission. Ibid. Significantly, there was minimal prejudice to Kevin through the letter's exclusion, since

caseworker Thompson testified about the Division's contact sheets, which contained much of the same information discussed in the letter.

Affirmed.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION

A-5639-17T4